Thank you everyone for your indulgence. Mr. is it D'Arminio? D'Arminio. I'm sorry, D'Arminio. Still, I guess, good morning. May it please the Court. It's good and it is good morning. Lou D'Arminio, Price, Mishelman, and D'Arminio for the appellate, and I'm reserving three minutes of my time for rebuttal. I guess the case is about several things, but the critical and the larger level is what's the level of proof required by a municipality in a First Amendment challenge, especially at the summary judgment phase? What if they'd offered no evidence, as in Metro Media, and just come in and said, you know, we know what 295 looks like right now, and the last thing we need in Mount Laurel is to have this highway,  so we're just going to say it may be bad, but we've got to draw the line somewhere. No more billboards. Under Metro Media, what would be wrong with that? Clearly no good. First, Metro Media was a case where it was stipulated facts, and the court there specifically said, well, there was really no evidence. The parties didn't really come up with evidence either way. And look at the New Jersey cases. If they can make an argument to ban all billboards based upon just looking at 295 without any empirical studies, and the cases said they don't need empirical evidence, here they got empirical evidence and were into the age-old statistical debate about the difference between correlation and causation. I would disagree with that point, that they don't need any evidence. I mean, the Retton case versus Playton, I love the names of all these adult books. Well, I know, we can tell what that case was about. Yeah, it is. You know, they said that there had to be some evidence, there had to be some studies. They didn't have to be a study of the town, but there had to be some relevant studies. Well, on the aesthetics point, though, Mr. D'Arminio, let me read you something from Metro Media and have you respond to it. This is the language of the plurality opinion. It is not speculative to recognize that billboards, by their very nature, wherever located and however constructed, can be perceived as an aesthetic harm. And then it goes on later and says, such aesthetic judgments are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to see if they are only a public rationalization of an impermissible purpose, but there's no claim in this case that there's an ulterior motive to suppress the speech. Now, when I read that, I understand the Supreme Court to be saying, in the absence of some evidence, not brought forth by the government, not brought forth by Mount Laurel, but brought forth by somebody like your client Interstate, that there's a nefarious speech-killing purpose, that in the absence of that, just as a matter of law, billboards can be viewed as an, quote, an aesthetic harm. How is that an incorrect understanding of what the Supreme Court said? Your Honor, that's never been the case. In the subsequent cases, if you look at Bell followed, Bell v. Stafford, which is a New Jersey case, it followed Metro Media, and Justice Hanlon there specifically said that a municipality can't just wrap itself up in, like I can't wrap myself up in the First Amendment, a municipality can't wrap itself up in just aesthetics and traffic safety. Let me read something else from Metro Media. This is from page 508. If the city has a sufficient basis for believing that the billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. Now, I know you're going to go after the language sufficient basis, but let me go back to Brenton, which you mentioned a little while ago, where the court said the ban is okay so long as the evidence relied upon is reasonably believed to be relevant to the problem the city addresses. It doesn't have to be airtight and there can be a battle of experts on each side, but as long as the city reasonably believes its own inquiry, why isn't that enough? And that's a lot of thought, and just bear with me a second. As I was going through this this morning, it dawned on me, to the extent that you're arguing that where, and I think this is what you're arguing, here you've got a study on one side, a study on another side, and you're making some, at least in my mind, some very valid, I think, attacks on some of their studies. Some of them are really a proxy for busyness of the intersection because that's where you put the billboards. It doesn't necessarily, it's a causation versus correlation. In fact, you have more accidents there. It may just be a measure of how busy the intersection is, not the fact that billboards are there. But even if that's true, you're saying it's a question of fact. If we get to that point, then why aren't we turning fact-finders, judges and juries, into local legislators and zoning boards? Because it's then the fact-finders that's going to have to weigh the quality of the evidence and determine whether or not the aesthetics are really going to be sufficiently diminished to allow an infringement on the non-commercial, but nevertheless protected, I mean, on the commercial speech. It seems to me the unavoidable result of your argument is that judges and juries become zoning boards. No, they don't, Your Honor. The zoning board is responsible for making factual determinations based on certain specific municipal land-use law requirements and the like. And the legislature's got to make constitutional decisions, and the courts just review them. And that's what we're saying. I'm going to seize on the issue that you just said. Well, yeah, but constitutional, it's based upon some rational evidence. And they have to have the cases talk about plausible basis. They talk about reasonable basis. They talk about sufficient evidence. That's the Metro Lights, and Metro Media talks about that. But Metro Media talks about it is undoubtedly the case that these billboards can be viewed as an aesthetic harm. And Vincent, which was not a plurality opinion, said, quote, in Metro Media, the court considered the city's interest in avoiding visual clutter, and seven justices explicitly concluded that this interest was sufficient to justify prohibition on billboards. We reaffirmed the conclusion of the majority in Metro Media. Then you would be taking the position, I guess, and it's not a position that other courts have taken. I guess the Ninth Circuit takes that position. I'm just reading the language from the United States Supreme Court. What are we supposed to do with that? But there are other cases that have not taken that position on the basis that it still is a matter that you have to individually each time come up with a sufficient basis, and you have to look at, you should look at the lookout. What is the sufficient basis? Because in Edenfield, the sufficient basis was some quantum of evidence beyond its own belief. That was sufficient, some quantum of evidence beyond its own belief. And here we've got 37 studies. Some of them I will concede are flawed, but not all of them are flawed. And even if all of them were flawed, they would still have some quantum of evidence beyond their own belief. You can argue whether or not it's a reasonable conclusion based upon those studies, but it seems to me that the Supreme Court has told us in Edenfield, in Metro Media, in Playtime, that as long as we're not talking about, and we're not talking about in this case, an improper motive, that you really have to defer to what the township views in protecting its own aesthetics. Safety is maybe a better argument for you, because maybe the studies do undermine their argument. But aesthetics, as I was saying before we came out here, your argument seems to be, look, 295 is already a hellhole. So what difference does it make if we just slap up some Dr. Pepper billboards, because it's already an eyesore. That's not what we said. We said with proper, that it's an industrial, it has industrial uses on both sides, and that with proper spacing, it would be appropriate to have out there advertising. Well, that's a much nicer way of saying it, Mr. Dermine, but isn't what you've been arguing, and what Mr. Cowker's expert report says, amounts to the very same thing, that this is an industrial zone, so it's already got problems. This won't make it any worse. Then that sounds like Mr. Cowker is setting himself up to replace the judgment of the city planners and the city zoning officials. Why is his different opinion entitled to so much weight that it requires a jury trial to decide whether, as a matter of fact, 295 is so bad that this can't make it worse? I would go back to that even the Metro Media case talks about a sufficient basis for all of them. Now, in that case, based on those facts and those evidence, our position would be, in the stipulated facts, it was like after a trial, and we're in the summary judgment stage, the court said that, okay, this makes sense for us, this is reasonable, we won't disturb it. But that would then rule out any challenge to any ordinance ever. And there have been subsequent cases over the course of time. What about billboards? Any billboard ordinance ever. That's what I mean. Excuse me, I should have said that. Could you not, under Metro Media, make the case, if you had evidence for it, that they're banning billboards because they don't like the non-commercial message we've got, or they're trying to stamp out speech? I mean, they were careful to say, in the absence of evidence of an ulterior motive that's inappropriate, we're into judgments about aesthetics, and those defy objective determination. I mean, what is the language of Metro Media if not saying, we're going to give the governing body the power to make a judgment about what is and isn't aesthetically pleasing for their township? But could Metro Media mean that any aesthetic judgment could possibly be? This is the only assumption could it reasonably mean, after all these years and all the cases that there have been cases, with Metro Media in place, that have knocked down billboard bans, that, say, a location in a heavily urban area where there's entirely industrial, that it would be appropriate to out there advertising, and there's no out there advertising in the area, would that mean that a total ban in that area would be improper without the ability to challenge it? If that's what it is, then I guess we're not going anywhere with this argument, frankly. Well, let's look at the track piece for just a second. The Supreme Court in Metro Media talks about palpably false factual foundations being insufficient. Is that the right standard? I mean, if you say what Mount Laurel relied on was palpably false, then you can attack them, but is that the standard you have to meet? I would say the standard is still insufficient evidence, and if you look at what the court relied on— What does the palpably false language mean, then? I mean, if your honors are accepting that it has to be palpably false for traffic— I'm just asking you what the— I'm reading to you language from the United States Supreme Court and asking you what we're to make of it. This is the language. They're quoting Railway Express with approval. They say it is the judgment of the local authorities that it does have relation, that is, traffic problems, to the thing that's being challenged. And nothing has been advanced which shows that to be, quote, palpably false. If I have to meet that standard in this case, and Judge Kugler didn't say I had to, but if I had to meet that standard in this case, I still could look at the studies that Judge Kugler relied on and indicate that, indeed, one of the studies— you would attack, in that sense, the applicability of the study. One of the studies wasn't even applicable to us. The Milwaukee County study wasn't a study that had anything to do with a static billboard. It was textual messages. It would be—actually, that sign's illegal in New Jersey because it changed every five minutes. Two of the studies actually we complied with, and that's part of our problem, too. The visual study had to do with a cone of vision. You have to have a 20-cone of vision in the forward roadway. We complied with that when we did our specific study of the locations. The 100-car naturalistic study said that you shouldn't have your eyes off the roadway for more than two minutes. That's a study that favors us. That's not palpably false, but they actually favor us, and we used that, and we provided expert testimony with Mr. Simok that actually showed that you could have five to six seconds on these roadways that were at a 20-degree angle in the forward roadway, which meant all that. That's why I said, it seems to me the aesthetics, it's a little bit easier for you to get at the safety issue. The aesthetics, I don't know how you get at that. If they have a good-faith reason to believe, and no one here is arguing that they're acting in bad faith, I don't think, they have a good-faith reason to believe that their stretch of highway is going to be better without billboards than with it. Boy, that's a hard one to knock down. That's almost like saying, it seems to me, it's hotter in the summer than it is in the winter. How can you argue with that? But even if we say that there are appropriate areas, we say that there are the ways, we argue that there are ways of framing an ordinance. Even their aesthetic expert, which was their planner, though he didn't want billboards, I'm not saying that he did, did agree that there are less restrictive means, because there's other prongs of that test, the central Hudson test, to meet the concerns that they had with regard to aesthetics. So maybe that becomes the argument. Well, since the law allows them, the First Amendment doesn't prohibit them from banning all billboards, given the necessary threshold is showing, the whole less intrusive means inquiry, that's not really part of this test. But even if the ban is, where is then the alternative means of communication? I mean, is all that now out of those? Excuse me. It may not be an alternative that would give you billboard space, but there's no constitutional right to put a message on billboards. They can't keep you from putting your message on billboards in the discriminatory way, and you're not alleging that they are. They have to have some quantum of evidence, looking at Edenfield, to believe that what they're doing addresses their concern. They've got 37 studies. Let's assume that 90% of the studies are lousy studies done by people who don't understand statistics any more than I do, and therefore, facially, they're invalid. You still have two or three valid studies left that would give them the quantum of evidence they need to say it's safer without billboards, and as bad as it may look now, it looks better now than it would with billboards. But you deserve some time. I don't mean to sandbag you that way, but feel free to respond to me on rebuttal. Okay. Thank you. Mr. Norman? Good afternoon. The one fact that I think is very unique in the First Amendment noncommercial speech context is the Metromedia case has been referred to as the law of billboards, and the Edenfield requirement of quantum of proof was not required in Metromedia, and I think it's essentially, there's an exception carved out from Edenfield that preceding Metromedia, there was already enough instances of legislative judgment and judicial decisions that there was no doubt that that was a substitute for satisfying the third and fourth prongs of central odds. Mr. Norman, who's got the burden of proof to show there are or are not adequate alternative avenues of expression? Well, if you read Metromedia, they do engage in analysis of alternative forms of communication, and the context of it is not whether or not you can have a billboard. The question is, do you have reasonable alternatives for advertising by science? And who's got the burden of either showing that there is or there isn't those alternatives? Well, I believe the facial showing has to be made by the party making the challenge, and of course, Mount Laurel's response is, there's nothing in the township ordinance that prohibits advertising an on-premise sign, and that was the holding in Metromedia. They said that the town went far enough. They decided to allow some signs, which are on-premise signs, but to control the sign proliferation issue, they said you can't have off-premise signs. And essentially, that's coming right out of Metromedia itself. On a second point, if you look at the specific context here, there's nine towns that surround Mount Laurel Township. Five of them, and our expert report at 43A of the appendix, or 44 to 46A, but we presented, our planner did a study, and five of the nine surrounding towns, immediately around the periphery of Mount Laurel, allow billboards either as a permitted use or a conditional use. So that's one relevant factual piece of evidence, that there are alternatives, and his study also showed that Mount Laurel is traversed by State Highway Route 73 and State Highway Route 38. There's 18 billboards in South Jersey on State Highway Route 73 in the vicinity, and 14 billboards on Route 38. Now, there's two billboards in all of Mount Laurel, a town with 40,000 people, and that's because the town 25 years ago adopted the billboard ban. So, you know, Mount Laurel has planned, engaged in the planning of controlling sign proliferation. They've been doing it for a long time, and there is alternatives. The billboard company can go to other municipalities. The other evidence at 74A of the appendix is Interstate's business itself. They have... Our planner did a study of all the billboards in Burlington County and found, and we obtained this through discovery, that Interstate has 27 sites of billboards in Burlington County, and there's 36 billboards at those 27 sites. So it's beyond question that there is opportunities to seek billboards. You can lobby other municipalities. That's an option. And with... I guess I'm wondering, is it really relevant to say your alternative means of expression in Mount Laurel is to leave Mount Laurel? It seems sort of like what you're arguing is that Mount Laurel can ban the speech, and if you don't like it, there's all these neighboring townships you can go to to speak in. Doesn't Mount Laurel have an obligation to have alternative avenues of free expression? Well, my analysis of the case law, and believe it or not, it was in your opinion in the Philadelphia case, is that the alternatives, the rights of alternatives, do not belong to the billboard company. It's the right of the advertiser. If AmeriHealth wants to put a sign on a billboard, what rights does AmeriHealth have to advertise in Mount Laurel Township? They can advertise in the newspaper. They can advertise on the Internet. There's all kinds of avenues on buses. There's plenty of medium in the year 2012 to allow for advertising, some of which didn't exist in the early 1983 when Metro Media was decided. So I think in a historical context, I think the issue of alternative available forms of communication, I think take on less importance in today's society than existed back in 1983. Do you have any record about whether or not someone going to or from Mount Laurel, or even living within Mount Laurel, would be likely to see one of these other locations than one of the other? To me, New Jersey is just a mess of highways, and then they have these disasters waiting to happen called jug handles. In order to turn left, you've got to turn right. Every time I go over there, I get lost. But to me, it would seem that, I don't know if the record reflects it, that in terms of alternative advertising, the record may reflect that the nature of the layout of the highway system, especially if you're talking about interstate, is such that you're as likely to see a billboard in one of these other counties as it would be if it were posted in Mount Laurel. But if that's not in the record, then that's not something we can consider in terms of an alternative form. Actually, I think if you lived in Mount Laurel, and there were billboards on 295, and let's say you took 295 to and from work, I would think after you drive it 300-something days a week, you'll tune out what's on the billboard. You really, it'll just become background music to your eyes. It's no traffic safety issue, right? Yeah. Yes. Well, it's, you know, but there are those who traverse I-295 who are not from Mount Laurel. They may be affected from a traffic safety standpoint. We presented the studies, the quantum of studies. And the reason Mount Laurel presented those studies was the decision in the Cherry Hill case was the law of the District Court of New Jersey in 2009. And we had, Mount Laurel had to comply with that, although it was of the view that we didn't, it did not believe that it had to supply the studies. Was it a mistake for the District Court in this case to require evidence? I mean, the court relied on, if I'm not mistaken, a New Jersey case. Yes, Bell v. Stafford. Yes. And said, we want you to come forward with evidence, Laurel. I think it was a mistake, and the reason is, and I actually brought the Bell case with me because there's an excerpt in it which is right on point. In Bell, the Supreme Court of New Jersey emphasized that the particular sign in Stafford not only prohibited non-commercial speech, it also prohibited political speech, free speech. And that makes that case a little bit different than our case, which our case had the substitution clause. So our case is content neutral. The case in Bell v. Stafford was involved, the Supreme Court found that it constrained free speech, political speech. And if you read the New Jersey State case law in Bell and in the subsequent cases on billboards, interpreting Bell, they really impose almost a strict scrutiny type test and a least restrictive means test. If you read those opinions, we think that's wrong. Mr. D'Arminio, in response to some questions we were firing at him, said Metro Media, and I'm sure he'll correct me if I've misunderstood him, but I understood him to be saying you really can't take Metro Media to mean that aesthetic judgments are beyond all question because we have later cases that say you need some evidence. Is he right or wrong about that, if I've understood him correctly? I think that Metro Media, the language in Metro Media itself on aesthetics essentially says it's elementary that billboards by their nature have an aesthetic impact. So if there is a legislative judgment by the town to say we do not want billboards in our town, I think the courts need to respect that. If that's true, then I have two questions. One, what do you say in response to Mr. D'Arminio's point that there are later cases that seem to imply you do have to come forward with evidence? And second, what was it that motivated the district court here to say give me some evidence? I could see the argument that a town relying on aesthetics, the banned billboards, works in a town like Mount Laurel where they've kept them out by zoning for 25 years and there's only, the character of the town is billboard free. But if you change the setting, let's say tomorrow we went, the setting was Camden and someone in the city of Camden decided no more billboards. And if you drive over the bridges, there's plenty of billboards. I mean, just from that sort of background context, if the rationale for Camden was aesthetics and if the character of Camden was such that there already exists many billboards, well then the aesthetic rationale for the prohibition really doesn't fly. And that's, I mean, that's true in any zoning case. How would they get to the point where they want to rein things in? So they've got this rash of billboards all over the place and they finally say enough is enough. How would a local agency go about saying we're saturated, we can't have any more billboards? Well, I think that's supportable too. I guess the question is, you know, if the character of the municipality is such that there's already so many billboards that there's just no, I just think it's a tougher fight because once you allow them, and I think that's if you read the New Jersey State Court's decisions, if you have a zone that allows billboards, they actually are much tougher on the towns in their particular zones where they don't allow them. They say, well, you already allow them here. Why don't you allow them there? Mr. D'Arminio, I think, and please correct me if I'm wrong, that the character is commercial and industrial. The character is billboards, obviously, or not. But the character is commercial and industrial. Therefore, your aesthetic concern is really not advanced by putting up billboards because of the nature of the community that we want to put these billboards up in. Well, that's a subjective opinion. If you took a drive up I-295, you would also see that it is very treed. It doesn't have an urban-type viewscape. When you're driving on I-295 up through Mount Laurel, it really doesn't present that kind of – Well, his response, I guess, would be, well, look, we're not going to intrude in the areas of I-295 where the trees are, but there's plenty of areas on I-295 where the nature of the community and the nature of the surrounding territory – Well, just that sort of analysis is – I think that's some of the analysis in Justice Brennan's concurrence where he said you need to go into a site-specific analysis. The only problem with that is the seven judges told him he was wrong. And that's in the taxpayers for Vincent and several other circuit court decisions that essentially you don't – I mean, that view was rejected, that you have to do a site-specific analysis to say, well, where do they want to permit – where does the billboard company want to erect the billboards? Thank you, Mr. – Okay, thank you. Your Honor, just on several points, looking at the Edenfield v. Fain case, if you would look at our response, our briefing response, I mean, our position there was that in a way that was after Metro Media and it modified Metro Media because it said you had to come up with a reasonable basis or with evidence to support a complete ban. And that's where I think we would hang our hat on to – But at the end they said some quantum – Whatever that standard is, is that it's not just a slam dunk. They could not just say, you know, aesthetics and safety. And if you look at – please look at the Bell case, because though Bell did cite Metro Media, Justice Handler also said in that case that, you know, we're talking about some very valuable rights here. It's commercial speech, but it's still a fundamental right, and there the typical deference that you give to municipalities with regard to zoning matters doesn't hold true. And so, I mean, he had a separate basis for that based on – Well – And on fundamental – If – I'm sorry. Go ahead. If the Supreme Court of New Jersey in Bell says you need more, but the Supreme Court of the United States says you don't – Sure. Would we fall? Of course you do. But nevertheless, I would still rely on Ennefield, and I wanted to – Sixth Circuit just within the last month, September 10, 2012, in a case called Bench, Billboard Company versus City of Toledo, said the city of – the city met its burden at the third prong of the central Hudson inquiry by relying on the Supreme Court's finding in Metro Media that the accumulated common-sense judgments of local lawmakers and reviewing courts have established that billboards are real and substantial hazards to traffic safety. That finding may substitute for the independent quantum of evidence that the city would otherwise have to put forth to establish that its regulatory regime addresses a concrete harm. And therefore, we need not decide whether the city would have met its burden to do so. So I take it you'd take issue with the Sixth Circuit's – Right, and I guess this court would have to see if it agrees with that in this situation, because, I mean, how valuable are these rights when you get right down to it? But a couple of other quick points. They mentioned this swap-out situation, and I do want to say there that this is where you could swap out a non-commercial message sign, let's say a message sign, for an on-premise commercial sign. And I think we've got to say there that the emperor has no clothes. I mean, we gave examples of, you know, will the owner of the Mount Laurel Mall, you know, put up – take off Target, take off Bed Bath & Beyond, take off all these companies that it has leases with to put up – and we gave several examples of billboards and anti-abortion billboards and anti-President Obama billboard, an anti-pro-gun billboard. Would they actually put that up? Would they actually do those sorts of things? That is a total sham, and that I think we have challenged in our papers. We've talked about cases where there's a false sense, the Exxon case, the Sprint case in New Jersey, or the Florida case, where we talk about for at least commercial speech, that's a sham, and that that should be considered and that should be knocked out. Again, if the Supreme Court is saying that that's an effective means of meeting at least the burden for non-commercial speech, then the emperor doesn't have any clothes. By the way, we did challenge every single study, even the ones – of all these studies, and I took his position, Mr. Lewornia, their expert, says, well, you know, I know these studies are kind of all over the place. But he said that there were four studies that he thought were valid, and some of them are the same that the court picked out. One, we agreed, the natural study, the 100-car crash study, and we complied with the 100-car crash study. The other one, Madigan Highland, is a correlation study, and we did discuss that study. The other ones, the Fostman and the Wiener review of them, we also took apart by our expert witness on a statistical basis, on the bad input. It took every accident. It wasn't a similar roadway to ours. We discussed every study. And it's very interesting, the study that – Let me ask you this real quickly. Even if we accepted what you're saying about the traffic piece of this, can you win if the aesthetic piece still stands in your way? In other words, is it enough for them to say, it's our aesthetic judgment, we've been doing this for 25 years, that they win regardless of whether their traffic studies are palpably false? Taking the traffic away, there still is aesthetic – there still is this aesthetic problem. I have to recognize that, indeed, aesthetics is still, obviously, a valid governmental purpose. Standing on its own. Standing on its own. It would have to be a valid governmental purpose. And we did provide alternate locations. We provided locations. We provided pictures. We provided evidence, sufficient evidence to say that it's proper here. We provided alternate means. In whose judgment? In Mr. Conker's judgment. Well, but, Your Honor, we are talking about a summary judgment motion here. And there are cases in this district where, you know, so long as the evidence is not challengeable as, you know, under a Daubert or any other claim, it should be considered. I mean, don't we get some benefit of the inferences? I mean, one of the inferences, for example – Well, that's, in fact, that is the very question. Do you get the benefit of some inference that because you hired an expert to say, I think this billboard would look swell here, that that deserves to be overcoming the judgment of the town fathers and mothers that, no, they don't want a billboard there? Your Honor, it has to have some plausible basis. And that's what we're saying. And that's what we're saying. We're saying that Metro Media was modified by Enfield to that extent, and there still has to be some plausible basis, some reasonable basis for a total ban. Okay, Mr. Domenio, thank you. Thank you very much, Your Honor. Your argument is very, very professionally done on both sides. I want to thank you and commend you for your arguments and for your presentations and your briefs. We'll take it under advisement. Thank you. Thank you. Have a good day and a good weekend.